**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

THE UNITED STATES OF AMERICA, for the use and benefit of CARTER CONCRETE STRUCTURES, INC.,

*Plaintiff,*

v.

ARCHER WESTERN CONTRACTORS, LTD., INC., DEMARIA BUILDING COMPANY, INC., ARCHER WESTERN DEMARIA JV, II, TRAVELERS CASUALTY AND SURETY COMPANY, AND LIBERTY MUTUAL INSURANCE COMPANY,

*Defendants.*

CASE NO.:

JUDGE:

# COMPLAINT

Plaintiff Carter Concrete Structures, Inc. ("Plaintiff" or "Carter"), states its claims against Defendants Archer Western Contractors, Ltd., Inc. ("AW"), Demaria Building Company, Inc. ("DBC"), Archer Western Demaria JV, II ("AWD"), Travelers Casualty and Surety Company ("Travelers"), and Liberty Mutual Insurance Company ("Liberty") (collectively, Travelers and Liberty referred to as "Sureties," and all Defendants referred to as "Defendants"), as follows:

## **Parties**

1. At all times material hereto, Carter was a Veteran-Owned small business and Georgia corporation with its principal place of business in Stone Mountain, Georgia. Carter obtained the Service-Disabled Veteran-Owned Small Business designation in April 2012.

2. Upon information and belief, and at all time material hereto, AWD was and is an Illinois joint venture of AW and DBC. AW is an Illinois corporation with its principal place of business in Illinois. DBC is a Michigan corporation with its principal place of business in Michigan.

3. Upon information and belief, and at all time material hereto, Travelers was and is a Connecticut corporation with its principal place of business in Connecticut.

4. Upon information and belief, and at all times material hereto, Liberty was and is a Massachusetts corporation with its principal place of business in Massachusetts.

5. This dispute arises out of the construction of the Mental Health Inpatient & Outpatient Addition/Improvements Project at the VA Medical Center in Bay Pines, Florida (the "Project"), which is located in this judicial district. The Owner of the Project was the Department of Veterans Affairs (the "VA"). AWD was the general contractor. Carter was the concrete subcontractor.

## Jurisdiction and Venue

6. This Court has jurisdiction pursuant to 40 U.S.C. § 3131 *et seq.* (Miller Act) and under 28 U.S.C. § 1332 (diversity of citizenship).

7. Plaintiff is a citizen of Georgia. Defendants are citizens of Illinois, Michigan, Connecticut, and Massachusetts. There exists complete diversity of citizenship between Plaintiff and Defendants.

8. The amount in controversy exceeds $75,000, exclusive of interest and costs.

9. The Project and many of the actions, errors and omissions associated with the Project are located or occurred in this judicial district.

10. Venue properly lies in this forum pursuant to 28 U.S.C. § 1391(b) because many of the events that gave and continue to give rise to this Complaint occurred in this judicial district.

## Factual Background

### Summary of Conclusions

11. This is a civil action involving a general contractor's failure to pay its veteran-owned small business subcontractor for numerous delays, impacts, and costs on a government project. AWD breached its Subcontract with Carter and violated Florida and federal law in its mismanagement of the Subcontract and in withholding

payment from Carter. AWD's oppressive treatment of Carter on the Project wiped out Carter's working capital, forced it to lay off much of its key personnel, and crippled the company. AWD made false statements to the VA about its dealings with Carter, in an effort to avoid paying money to Carter that AWD received in trust for Carter from the VA. AW dominated, and continues to dominate the JV and the sureties. On information and belief, the behavior exhibited by AWD represents a pattern and practice of AW's. On information and belief, Travelers and Liberty were aware, no later than August 2016, of AW's pattern and practice and nevertheless did nothing to pay Carter.

12. The Sureties made no good faith effort to investigate Carter's demands for payment, and in fact made false statements to Carter in order to avoid the obligation to pay Carter money which AWD had certified to the VA were owed to Carter.

13. Carter believes and will prove that the actions and inactions of each of the defendants, and of one or more of the defendants in combination with one or more others, violated the standards the construction and surety communities expect and advocate with respect to the treatment of a company such as Carter.

Detailed Facts in Support of the Summary of Conclusions

14. The VA awarded Contract No. VA101CFM-C-0139 for the Project to AWD on April 8, 2011 (the "Prime Contract") in the amount of $91,989,000.

15. On April 8, 2011, Travelers and Liberty issued a Performance Bond and a Payment Bond ("Bonds") on behalf of AWD insuring its performance of work on the Project and insuring that AWD would pay subcontractors like Carter. Each bond was in the contract amount ($91,989,000) and given Travelers Bond No. 105540132 and Liberty Bond No. 13124171.

16. AWD and Carter entered into Subcontract No. 211060S05 ("Subcontract") dated as of July 27, 2011 but not executed by Sam Carter (President) until May 25, 2012, and for AWD by James Reichart (Healthcare Director) on June 5, 2012. At AWD's insistence and based upon its representation that the subcontract would be fair and in line with Carter's bid expectations, Carter began with the submittal process before it received a draft of the subcontract. Carter mobilized its team in Tampa, Florida on August 29, 2011 in anticipation of starting work on October 3, 2011. Carter's scope included the Cast-in Place Concrete under Specification 03 30 00. The amount of the Subcontract as signed was $11,400,000.

17. The Project involved the construction of a Mental Health Inpatient and Outpatient Addition ("MHA" or "Addition") to the VA Bay Pines Hospital at 10000 Bay Pines Boulevard. It was divided into two phases: Phase 1 and Phase 2.

18. Phase 1 consisted of work necessary to relocate existing structures and utilities out of the footprint of the Addition, which would then be built during Phase 2. Phase 1 involved building a new warehouse and loading dock to replace the existing ones in the Phase 2 work area, and building an oxygen tank farm to replace the existing tank farm located within the Addition footprint. Phase 1 also involved realigning the roadways to accommodate the Addition.

19. Per the Subcontract, AWD promised Carter that Phase 1 would start on October 3, 2011, and AWD would coordinate all of the work such that Carter would be complete with Phase 1 in 60 working days. Indeed, AWD agreed that Carter's contract price was "contingent upon a contract start date of October 3, 2011, and [did] not cover delays."

20. Once the work of Phase 1 was completed, the work in Phase 2 could begin after a brief demobilization of approximately 90 calendar days by Carter. AWD promised Carter that the Phase 2 work would be efficient in terms of time, and that AWD would coordinate its work so that Carter would be complete and topped out for Phase 2 in 195 working days, or January 2013. The plan to complete the work showed Carter beginning site work 148 days after topout.

21. AWD promised Carter that Carter's total work on the MHA itself would take 195 working days of unimpeded progress, meaning top out for concrete would complete in 195 working days from Carter's start on the MHA.

22. In 2011, Carter had a line of credit of $2 million, a bonding capacity with Liberty of $100 million, and net worth of $4.9 million.

23. Nevertheless, because of the construction market depression in the US, Carter (like other contractors, Carter believes) turned to work for the U.S. government to have a method to pay overheads, to keep valuable personnel engaged, and thus to survive as a business awaiting a hoped-for recovery. AWD was required to solicit proposals from small businesses, particularly, small veteran-owned businesses. AWD accepted a bid from Carter, a Veteran-Owned Small Business, for the concrete work on the Bay Pines project. Carter bid the job to AWD in March 2011, and AWD and Carter reached general agreement on price, schedule, and scope at a meeting in June.

24. The work involved was straight-forward concrete work, well within Carter's experience.

25. Carter took exception, in its original bid to AWD, to a concrete topping product, called Creteseal. In order to induce Carter to agree to purchasing and installing Creteseal as a part of its scope, AWD representatives Wells and Reichart misrepresented to Carter's Sam Carter and Will Jacobs at a meeting between AWD and Carter in AW's office, 4343 Anchor Plaza Parkway, #155, Tampa, FL, on June 2, 2011, what AWD stated was a "bid day" quotation from Creteseal. Carter used AWD's number in reaching a final price with AWD, only to learn later that AWD

had altered the Creteseal document and had thus misrepresented the price to Carter. The representation to Carter was false, and Carter believes AWD knew it to be false.

26. As part of its proposal AWD was required to present for VA evaluation AWD's proposed award of work to subcontractors which were small businesses and veteran-owned. On information and belief, Carter avers that AWD used Carter's bid price to AWD's advantage in demonstrating it had met, or exceeded veteran-owned and small business subcontracting goals or requirements of the VA. In doing so, AWD implicitly agreed that it would encourage, sponsor and facilitate the business growth of those entities, in line with the goals of the VA in requiring the use of such firms. Carter is an intended beneficiary of that trust. The VA assigned goals for this project were 5% for veteran-owned small businesses, Carter helped AWD exceed their goal by performing over 12% of the contract.

27. AWD was required to report on its subcontracting with Carter and similarly situated subcontractors directly to the VA. AWD has prevented Carter from obtaining from the VA the AWD Small Business and Veteran Owned business plan for this project.

28. AWD confirmed in August, 2011, the planned start for Carter of October 3. To be ready, Carter mobilized its field supervisory workforce on August 29, 2011. AWD thereafter delayed Carter's planned start from October 3, 2011, to a partial start on February 27, 2012 with a critical path schedule start of March 16,

2012. AWD did not issue a subcontract form to Carter until October 20, 2011. Contrary to Carter's expectations at bid time and during the June 2, 2011, pricing meeting in Tampa, the AWD form was extremely one-sided and onerous, so that Carter attempted to negotiate at least some terms that allowed Carter a chance for fair treatment,, assuming AWD lived up to its promises. Even though the parties had not reached agreement on a written contract, and because of its need to have some cash flow, having had personnel on site since August, 2011, Carter billed in late December 2011 for its mobilization and had every expectation that bill would be paid by AWD in late January 2012. When it was finally allowed to begin work, Carter began on February 27. Beginning field work then was the only way for Carter to get paid and thus have the cash flow needed to survive.

29. Once Carter had committed its men and resources to the project, AWD began its pattern and practice, on this job, of bullying Carter by refusing to pay it timely for work performed. AWD held, as of May 3, 2012, $1.1 million in Carter's gross billings in order to force Carter to accede to AWD's contract terms and conditions. Of that amount, $579,000 was overdue and had been paid by the VA to AWD on behalf of Carter.

30. This pattern and practice of using Carter's money to bully and coerce Carter continues to the day of the filing of this Complaint. Upon information and

belief, AWD received more than a year ago at least $3.4 million from VA on behalf of Carter and has paid none to Carter.

31. Upon being informed by Carter of this debt on January 15, 2016, Travelers and Liberty failed or refused to confirm the payment to AWD by the VA and denied that Carter had been delayed, deliberately and willfully ignoring the undisputed evidence of AWD's certification of Carter's claim for delays caused by AWD. Upon information and belief, Travelers and Liberty were aware of AWD's pattern and practice of bullying and coercion and nonetheless refused to pay Carter.

32. Carter notified AWD of its delays to Carter's work throughout Phase 1. AWD, on virtually a daily basis, failed to coordinate the work so that Carter could efficiently perform its work as planned. Instead of the 60 working days planned for Phase 1, AWD has admitted its delays to Carter's work of **165 calendar days.**

33. AWD mismanaged Phase 2 even worse than phase 1, causing 440 calendar days of **additional** delay to the completion of Carter's work.

34. AWD has admitted in writing that it delayed Carter at least in the following respects:

a. Phase 1 – Parking Lot Delay – 17 calendar days
b. Phase 1 – ASI-001 Delay – 85 calendar days
c. Phase 1 – ASI-002 – 62 calendar days
d. Phase 1 – Warehouse Foundation Submittal Package Delay – 1 calendar day
e. Phase 2 – Telecom Utility Delay – 440 calendar days

These delays are not in dispute as the VA has approved all 605 days of delay.

35. As a result of these delays (combined with AWD's pattern and practice of refusing to pay Carter timely as required by Florida law) Carter was unable to utilize its concrete batch plant, lost key personnel, incurred significant field and home office overhead expenses, incurred interest and other carrying charges, incurred escalation, used up its working capital, lost its bonding capacity and essentially was reduced to a shell of itself.

36. To attempt to mitigate these damages caused by AWD, Carter approached AWD in November 2013 to assist Carter financially, in order to reduce the impact of AWD's mismanagement, oppression, misrepresentation, and delays. Carter was summarily refused by AWD, even though AWD was obligated to mitigate the damages it caused Carter. At the time, AWD was made fully aware of the dire financial chasm into which AWD had forced Carter and of the consequences to Carter caused by AWD's delays. Yet, AWD's Reichart then bullied Carter and threatened to make a claim against Carter's surety bond based upon Carter's request that AWD mitigate the damages AWD had imposed on Carter.

37. Within a month of bullying Carter, on December 9, 2013, AWD formally admitted to Carter, *in writing,* that it had delayed the job with four delays to Phase 1: (a) Parking Lot Delay (17 calendar days), (b) ASI-001 (85 calendar days), (c) ASI-002 (62 calendar days), and (d) Warehouse Foundation Submittal

Package Delay (1 calendar day). Along with this admission, AWD asked for Carter's help in making a claim to the VA, so that AWD would obtain some financial relief for itself and, so AWD assured Carter, for Carter. Carter assumed that AWD's request was made in good faith and that, in part, AWD intended to pay Carter for the delays caused to Carter by AWD.

38. AWD **certified** Carter's claim to the United States government. Attached hereto as **Exhibit A** is what AWD provided to Carter in response to Carter's request for Carter's claim as certified by AWD to the United States government. In this claim, Carter requested 605 days of time extension and $5,537,894 in additional incurred costs. AWD represented to Carter that it had certified this claim to the United States government, and AWD did not state to Carter that it had qualified or conditioned Carter's claim in any way or to any degree.

39. AWD filed claims before the United States Civilian Board of Contract Appeals ("Board") admitting to each of the delays claimed by Carter. The total of AWD's certified claims was for 605 days of extensions of time and $24,628,128 in equitable adjustments, which included Carter's claim of $5,537,894 in its entirety, along with claims by other subcontractors.

40. Of the amount certified by AWD to the Board, AWD certified $5,537,894, the entire amount of Carter's then-submitted Change Order Requests for delays to Phases 1 and 2, as being due to Carter.

41. AWD recovered a judgment on its $24,628,128 claim in the amount of $15,800,000, including an Extension of Time to June 2, 2015 (an extension of 605 days) and a release of liquidated damages in the amount of $980,000.

42. This represented a 64.15% recovery by AWD for the amount certified as due, and a recovery of the full Extension of Time requested.

43. AWD paid Carter nothing from its recovery, notwithstanding AWD's promise to pay Carter its minimum pro rata share ($3,552,796, which is 64% of $5,537,894) of any amount recovered from the VA, based on Carter's Change Order Requests (COR).

44. On January 15, 2016, Carter put Travelers and Liberty on notice of the damages being caused to it by AWD by AWD's non-payment of the amount paid to AWD on Carter's behalf, provided the sureties with relevant correspondence, and demanded that Carter be paid.

45. Despite demands, neither Travelers nor Liberty has paid Carter the amount due.

46. When AWD, Travelers, and Liberty refused to pay even the minimum pro rata share of $3,552,796, Carter recalculated its damages with actual costs incurred arising from the 605 days of delay. The amount of damage suffered because of the delay is approximately $7,025,000. Deducting the $3,552,796 paid to AWD by the VA as a result of Carter's claim, the remaining minimum amount due to Carter

for the admitted 605 days of delay is approximately $3,472,000 after Carter is paid the $3,552,796 AWD has already been paid on Carter's behalf.

47. AWD continued to delay Carter's work, beyond the 605 days, as a result of AWD's lack of coordination, errors, and omissions. Carter wrote AWD on January 28, 2016, regarding the additional extended duration of site concrete work, and demanded schedule and monetary relief because of the additional delays caused by AWD. Aware of AWD's pattern and practice of oppression of Carter, Carter sent a copy of the letter to AWD's sureties, expecting each to honor the terms of the Payment Bond.

48. Following the 605 day delay, Carter achieved topout on September 5, 2014. Under the original, much-delayed schedule, Carter was to perform interstitial concrete work while AWD would accomplish the other work in the hospital and get the site ready for Carter to perform site work concrete (fountains, courtyards, and the like). Notwithstanding that AWD was not in fact ready for Carter to remobilize and work efficiently on the site work scope, AWD ordered Carter to remobilize on June 1, 2015. The original lag was 148 days from topout to start site work; however, 269 days elapsed before site work could start on June 1.

49. Carter did as it was instructed by AWD, and it expected to complete its remaining work in 58 calendar days. AWD had previously agreed that it would coordinate the work such that Carter could complete this site work scope in 58

calendar days, and scheduled this duration. Carter thus expected to complete its work and fully demobilize on or about July 28, 2015.

50. AWD instead delayed Carter's completion of its site work because of AWD's lack of coordination of its other contractors, AWD's creation of conditions in the hospital that allowed mold to form, and other delays caused by AWD.

51. These delays are and were the basis of Carter's Change Order Request (COR) #60.

52. Notwithstanding Carter's complaint in its January 28, 2016, letter, that AWD was again forcing Carter to finance the continued delays, AWD did not reply nor supply relief, continuing its pattern and practice of oppressing Carter even after receiving the VA payment of over $15 million less than 10 days prior on January 19, 2016.

53. Carter supplied Travelers with various claim supporting documentation on February 3, 2016. On February 22, 2016, the Sureties informed Carter that Carter's claim documentation (which had been sent to the Sureties on January 15, February 3, and February 4, 2016) had been passed to its principal, AWD. On information and belief, Carter asserts that the Sureties did not perform a good faith investigation of the merits of Carter's payment demand at that time, or at any time.

54. Carter submitted a revised COR #60 to AWD on April 22, 2016, following additional delays by AWD to Carter's completion of its work and to

Carter's demobilization. Carter summarized its damages and provided a detailed analysis of the delays by AWD to Carter's work, commencing on July 29, 2015, the day after Carter and AWD had agreed Carter would be able to demobilize. Ultimately, AWD delayed Carter's site concrete and other related work by 373 days, further damaging Carter.

55. These 373 days (121 days of new delay to the start of site work, after top out, plus 252 days due to site concrete delays not attributable to Carter) were in addition to the 605 days of delay already acknowledged by AWD as its responsibility. Carter's job costs associated with this extended duration amounted to $590,000. AWD did not respond to Carter's letter updating COR 60.

56. Carter wrote the Sureties on May 26, 2016, requesting payment under the Payment Bond. Carter explained it was delayed 605 days in the first two phases of the Project, that AWD admitted the delays, that AWD received substantial compensation for the delays, including for the concrete delays directly affecting Carter, and that Carter was owed $5,537,894 on its change order requests for the 605 days of admitted delay. Furthermore, Carter explained that AWD had failed to pay Carter $240,514 from pay applications pending from September to October 2015. By failing to pay these amounts, AWD was in violation of federal and Florida prompt payment acts. Carter demanded that the Sureties honor the Bonds and pay Carter $6,078,408, which was inclusive of interest. In addition to those amounts, Carter

explained it had been delayed an additional 373 days by AWD, beyond the 605 days for which AWD had been paid by the VA, and was owed $590,000 for that delay. Carter had demanded the Sureties' performance on January 16, 2016, and in this May 26 letter, again called upon the Sureties to honor the Bond.

57. The Payment Bond is a standard US government bond. It made the Bond conditional on AWD's "promptly" making payment to Carter, among others. The Sureties were obligated to treat Carter in good faith and with fair dealing and to investigate Carter's payment bond claim independently of any demands or representations by the sureties' principal, AWD. The payment bond expressly states that each of Travelers and Liberty are "jointly and severally" liable for the obligations of the payment bond.

58. Each Surety was therefore obligated to make an independent investigation. On information and belief, Liberty made no investigation whatsoever. It apparently neglected its duty and expected Travelers to investigate for Liberty.

59. Instead, Travelers dawdled. It demanded that Carter file a claim. Carter had already done so on January 15, 2016. Because Liberty, the co-surety, is also Carter's bonding company, Carter expected the request by the Sureties was in good faith, so it complied and resubmitted the requested information.

60. Simultaneously with its effort to be paid by the Sureties, Carter wrote AWD on June 7, 2016 regarding various outstanding items on which Carter had been

awaiting a response from AWD. Carter inquired into the status of its claims and outstanding scope change orders for which no payment had been received. Carter asked for the status of punchlist items from the VA, as Carter had received no punchlist items from the VA through AWD.

61. Travelers wrote Carter on June 29, 2016 regarding the contract accounting. Travelers stated that retainage claimed by Carter was not due at that time but did not explain the reason for its conclusion. Travelers stated that at no time had Carter provided Travelers with any documentary support for its delay claim and for its costs, yet Carter had done so twice. Moreover, the Sureties' principal, AWD, had certified Carter's claim to the US government, as the Sureties knew, or easily should have known, given that AWD's claims were the subject of public filings before the Civilian Board.

62. Travelers and Liberty nevertheless denied the claim, in breach of their several obligations, further damaging Carter.

63. Carter wrote Travelers on July 25, 2016 acknowledging the June 29 letter and calling into question Traveler's "investigation," stated that Travelers' recitation of the facts reflected information from its insured AWD and failed to take into account any of the various claim forms, accompanying documentation, and the Sureties' insured's own certification of both the time and money claimed by Carter.

As such, Carter warned Travelers and Liberty that each had failed to investigate Carter's claims as required by Florida law.

64. Carter also reminded the Sureties that the 64% recovery of AWD on its appeals to the VA demonstrated that Carter's claim was well-regarded and substantiated by the VA in paying AWD. Carter again pointed out that the Sureties' statements that neither had support for Carter's claims was not factual. Carter again demanded payment from each of Travelers and Liberty under the Payment Bond for Carter's portion of the funds received by their insured from the VA. Carter again informed the Sureties that VA representatives had informed Carter that Carter's claim and its supporting documentation was highly regarded by the VA in reaching a settlement with the Sureties' insured, AWD.

65. Travelers and Liberty denied Carter's claim or any portion of it again on July 28, 2016. Travelers and Liberty made up facts to justify the denial. They stated that AWD disagreed with the contract accounting submitted by Carter, but did not bother to point out what that disagreement was, because it in fact was minuscule. They stated they had "discovered" that Carter refused to do any additional work related to the stairwell concrete finish. The Sureties made this up. They stated that Carter has failed to supply copies of any supporting documentation of its costs. The Sureties made this up. Travelers stated that Carter was not responsive to AWD's communications and had not returned its calls. The Sureties made this up.

66. At the time of this exchange, Carter had to renegotiate a loan with its prime lender. Had the Sureties honored the solemn promise they made the US government in the Bond, Carter could have resolved the loan with its long-time banker and regained some of its prior financial health at a time when the construction market was showing signs of strength in Georgia and in Florida. The Sureties were aware in July 2016 and earlier of the precarious financial condition of Carter, of the construction market recovery, and of Carter's negotiations with its long-time banker.

67. On information and belief, the Sureties, at least by July 28, 2016, adopted and aided and abetted the pattern and practice of AWD of seeking to bully, if not destroy, Carter.

68. Carter updated its information on August 12 and August 25, in an effort to persuade the Sureties to honor their obligations under the bond.

69. Because of the non-payment by AWD and the Sureties, and at the request of a VA representative, Carter reanalyzed its Phase 1 and 2 claims on September 1, 2016, and calculated that its delay costs were approximately $7,025,000 for the 605 days of delay. Carter did not update this amount to AWD, at this time, as it still expected payment of at least the 64% due from the 605 day delay claim AWD had collected for Carter from the VA.

70. On December 5, 2016, Carter submitted to AWD its COR 60-Extended Site Duration Costs, requesting a time extension of 373 days and a payment in the

amount of $737,732 exclusive of interest. Carter calculated COR 60 based on its planned duration of 58 days for the site work concrete in Carter's scope. It claimed all costs for field overhead and site work after the 58 days. Carter's field overhead costs are time-related costs; Carter did nothing to cause any of the delays to the site work. Those delays are squarely attributable to AWD's defective and deficient management, or upon some unknown factor that AWD has either failed to inform or has concealed from Carter. Had Carter been permitted to complete the work in the 58 days promised by AWD, Carter is confident that it would have completed the site work scope of work for the amount carried in its estimate for the work, had it been allowed to do so by AWD.

71. On October 17, 2016, Travelers wrote Carter stating that the DCAA found, during its audit of Carter's delay claim records, that the supporting documentation was inadequate, and therefore reaffirmed its denial of Carter's claims. Travelers and Liberty took this position notwithstanding that Travelers and Liberty knew that the DCAA findings were preliminary, were based on legal conclusions not the province of the DCAA and, most importantly, had been ignored by AWD and by the VA in arriving at the settlement of the Carter claims certified by AWD.

<u>The Subcontract and the Payment Bond</u>

72. The Payment Bond incorporates the Subcontract terms. The Subcontract is attached as **Exhibit B** to this Complaint. The Bonds, including the Payment Bond, is attached as **Exhibit C**.

73. Section 3.6 of the Subcontract, Time of Payment, promises that "Progress Payments shall be due to Subcontractor no later than ten (10) days after receipt of payment from Owner by Contractor provided Subcontractor remains in compliance with the terms of this Agreement."

74. In Section 4.4, AWD sought to impose a no damages for delay clause on Carter:

> If the progress of the Subcontractor's Work is substantially delayed, hindered or interfered with through no fault or responsibility of the Subcontractor, then the Contractor shall either (i) extend the time for the performance of Subcontractor's Work by Change Order, but such extension shall be limited to that amount of time which will enable Contractor to meet its obligation to Owner to complete the Project in accordance with the Contract Documents, or (ii) require Subcontractor to accelerate or complete its Work with additional manpower and the expediting of materials, but Contractor shall be obligated to pay only for the costs of expediting material and costs recovered under Article 11.3 of this Agreement.
> Except for...acts of the Owner or third-party for which the Subcontractor's remedy shall be as stated in Article 11.3..., [AWD] shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delay, hindrance, interference or other similar event, caused by Contractor,...

75. To this day AWD has granted no time extensions to Carter. AWD has not even issued a Change Order request to Carter for the 605 days of delay which the VA has granted AWD.

76. In June and July 2016, the Sureties gave as one reason that Carter was not to be paid was because Carter had failed to perform and/or delayed the job. This statement was made up by the Sureties, was false when made, and was known at the time by the Sureties to be false.

77. Carter did not delay the job or any portion of the job that was material to the progress of the work.

78. In Section 11.3, AWD promised that it would pay Carter "on a pro-rata basis" out of any recovery the Contractor obtained from pursuing claims against the VA, and it promised that both AWD and AWD's surety had a "duty to pay Subcontractor" upon receipt of payment from the VA. (Section 11.3, as modified by Exhibit P)

79. AWD has not paid Carter any portion of the millions of dollars AWD has recovered from the VA on behalf of Carter.

80. AWD's Sureties have likewise not paid Carter and have dissembled in order to avoid their several duties to pay.

81. As a part of its pattern and practice to reduce Carter to rubble, AWD has instead insisted that Carter accept something other than Carter's "pro-rata" share

of the moneys received in trust for Carter. AWD has done so without once presenting any accounting that would justify any payment to Carter less than Carter's "pro-rata" share.

82. Moreover, Section 11.3 is a floor for Carter's recovery. In Exhibit P to the Subcontract, which is attached to this Complaint as **Exhibit B**, the "parties agree to the following Subcontract modifications: "***Nothing in the subcontract shall be construed to prevent Subcontractor from recovering cost of delay not the fault of Subcontractor."

83. The parties agreed in Exhibit P that Carter would be paid for its delays, regardless of the no damages for delay clause in Section 4.4 and of the "pay if paid" clause in Section 11.3.

84. Exhibit J to the Subcontract incorporates FAR 52.219-8, "Utilization of Small Business Concerns," into the Subcontract.

85. In Exhibit M to the Subcontract, AWD states that it "has established a policy to afford ... Veteran-Owned Small Business concerns (VOSB) opportunities to participate in all contracts... both public and private." AWD also agreed in Exhibit M that FAR 52.219-8, "Utilization of Small Business Concerns," will be included in all subcontracts which offer further subcontracting opportunities.

86. In the VA's Solicitation, the VA made clear that large business offerors, such as AWD, shall include "efforts to encourage, sponsor, or facilitate Veteran Owned and Service-Disabled Veteran-Owned Small Business growth."

87. VAAR 852.215-70, governing VA contracts, states that "in an effort to achieve socioeconomic small business goals," the VA shall evaluate offerors based on their "proposed use of eligible service-disabled veteran-owned small businesses and veteran-owned small businesses as subcontractors." And notably, "[n]on-veteran offerors proposing to use service-disabled veteran-owned small businesses or veteran-owned small businesses as subcontractors ***will receive some consideration under this evaluation factor***." (emphasis added).

88. Upon information and belief, AWD received substantial credit or benefit from the VA for its employment of Carter as a qualified Veteran-Owned Small Business in accordance with its policies encouraging the use of Veteran-Owed Small Businesses.

89. AWD nor Travelers nor Liberty has done anything to encourage, sponsor, or facilitate Carter's growth.

90. Each of AW, DBC, AWD, Travelers, and Liberty has instead deliberately and willfully attempted to put Carter out of business by refusing to pay Carter, by delaying Carter, by dissembling to Carter or the VA or both as to the

payments to Carter or the reasons for non-payment, and by taking advantage of the cash shortages of Carter to destroy its business.

Amounts Due to Carter

91. Delay Claim for 605 Days. AWD, Travelers, and Liberty have long owed Carter the minimum pro-rata share of the amount recovered by AWD from the VA on behalf of Carter. That amount is $3,552,796.

92. Carter updated its calculations of its damages for the 605 day delay claim, totaling approximately $7,025,000, on September 1, 2016. Subtracting the amount owed under Paragraph 91, Carter is owed the remainder of approximately $3,472,000 for the 605 days of delay.

93. COR 60. AWD, Liberty, and Travelers owe Carter 373 days of time extension and an amount of $737,732 for the delay caused by the events summarized above in Paragraphs 47-56 and submitted to AWD as Carter's COR #60.

94. Non-Delay Scope Changes. AWD, Travelers, and Liberty owe Carter $110,733, in non-delay related scope changes, including the following COR's.

95. COR 8 ($26,408) – RFI 151/203 Bollard Changes (submitted to AWD on August 10, 2012).

96. COR 17 r.2 ($38,210) – ASI 003J Changes, Canopy/Pedway MHA. This work is for scope that was changed by ASI 003J drawing changes. ASI 003J

changed the pedestrian walkway and canopy work. The largest changes to Carter's work were footing changes and pedway roof topping.

97. COR 20 ($4,897) – CEP Steel Column Piers. The design documents showed the work being accomplished in a manner than was impossible to construct. It showed the steel in some places being constructed before the slab-on-grade and other areas being constructed after the slab-on-grade. In reality, the steel needed to be constructed before the slab-on-grade. Therefore, for the areas that showed the steel being constructed on top of the slab-on-grade required new concrete piers to carry the steel. These were constructed by Carter at AWD's direction.

98. COR 32 ($831) – RFI 633 MHA Tower Walkway Embeds. This change occurred due to RSI 633 adding new embed plates for steel columns at the Roof Level. It included the survey crew to lay them out.

99. COR 49 ($10,710) – RFI 5314 Breezeway Bridge Foundation. RFI 5314 required demolition of a partial existing grade beam in order to recast in place new baseplates for the steel. It also included widening of the existing slab-on-grade in the area in order to do this work.

100. COR 50 ($9,417) – Repair Existing Slab Edge in CEP. In the Central Energy Plant, the new slabs met up with existing slabs. Significant work was required on the existing slab-on-grade. AWD requested that Carter perform these repairs, which required cutting, bushing and patching concrete.

101. COR 52 ($6,271) – RFI 5318 Bridge Footing Change. RFI 5318 increased the sizes of the canopy footings by increasing the thicknesses of affected footings by 4", and also added reinforcing steel.

102. COR 56 ($13,989) – 4000 psi Lightweight in lieu of 3000 psi. The designer increased the strength of lightweight concrete on over 2,100 cubic yards of concrete.

103. Unpaid Retainage. AWD, Liberty, and Travelers each owes Carter $120,432 for the unpaid retainage on the Subcontract, which is long overdue and which is payable under Exhibit P, as Carter's work is not the reason for any delay by the VA in paying AWD.

104. Unpaid Balance of Contract. AWD and the sureties each owes Carter an amount totaling $190,290 for the unpaid balance of the Subcontract. Carter's work is not the reason for any VA delay in paying AWD.

105. Creteseal Prebid Representation. AWD and AW owe to Carter an amount of $93,151 for its and their Creteseal prebid representation to Carter.

106. Interest. AWD, Travelers, and Liberty each owes Carter interest in the amount of $1,402,211 as allowed under Florida law, calculated through March 31, 2017, and continuing at a daily rate of $1,073.63.

107. Total. In sum, AWD, AW, DBC, and the Sureties each owes to Carter an amount no less than $8,250,000, and AWD and AW each owes in addition $93,151 because of the misrepresentation to Carter regarding Creteseal.

*****

108. AWD has used its resources and status as a large contractor to oppress, cripple, and nearly end the business of Carter, a veteran-owed small business. AWD's treatment of Carter on this VA job has been nothing short of appalling and falls below the standards applicable to the business community of contractors and sureties. Carter is entitled to good faith dealings.

109. Travelers has acted in bad faith in its complete failure to conduct an adequate investigation into the facts of Carter's claims. It cites a completely one-sided version of the facts, make up facts, and wholly ignores all information submitted to it by Carter, instead insisting that Carter has failed to support its claims—an allegation that the correspondence record immediately disproves. Moreover, it has cited facts and conclusions which its insured AWD has not even adopted, calling into question the basis for any of Travelers' conclusions supporting its denial of Carter's claims.

110. Liberty, notwithstanding its several liability under the Bond, abdicated its obligation to investigate and is itself liable for Travelers' misrepresentations, dissembling, and failure to investigate.

**COUNT I: Miller Act Claim as to Defendants**

111. The preceding allegations of the Complaint are hereby re-alleged and incorporated herein.

112. At the time of the events giving rise to this Complaint, Sureties maintained in favor of AWD the Bonds to cover a portion of the damages alleged in this Complaint, pursuant to the Miller Act, 40 U.S.C. § 3133(b).

113. Pursuant to the Miller Act, Sureties are and were at all times material hereto under an obligation under the Payment Bond issued in favor of Carter to compensate Carter for the costs and damages alleged in this Complaint and to pay in full for the work that has been completed by Carter on the Project, without regard to whether the VA has paid retainage and contract balance to the Sureties' principal, as any delay by the VA in paying AWD is not related to Carter's work.

114. If the Court were to determine, incorrectly Carter avers, that the Sureties are entitled to the pay when paid clause in the Subcontract, then the amount due now from the Sureties is $7,939,278.

115. Wherefore, Carter demands judgment in its favor and against Sureties, separately and severally, in the amount of at least $7,939,278, if not $8,250,000, pursuant to the Payment Bond, plus costs, interest, and attorneys' fees, and further legal and equitable relief as this Court deems just and proper.

**COUNT II: Unpaid Contract Balance for Work Performed as to AWD**

116. The preceding allegations of the Complaint are hereby re-alleged and incorporated herein.

117. Carter and AWD entered into a valid and enforceable contract, under which AWD agreed to compensate Carter for its work on the Project.

118. The Subcontract provides for the payment by AWD to Carter in the amount of $8,250,000, after all agreed-upon contract modifications, for completion of the work under the Subcontract.

119. Carter has fully performed its obligations under the Subcontract.

120. Carter has not been paid an amount of $190,290 for the unpaid balance of the Subcontract for the work performed.

121. If the VA has not yet paid AWD, Carter's work is not the reason for the VA's delay in paying AWD.

122. AW and DBC are jointly liable to Carter under the Subcontract.

123. AWD's refusal and failure to pay Carter this amount constitute a breach of contract.

Wherefore, Carter demands judgment in its favor and against AWD, AW, and DBC for its unpaid contract balance in the amount of at least $190,290, together with interest and attorneys' fees, all costs of this action and such further legal and equitable relief as this Court deems just and proper.

## COUNT III: Unpaid Retainage for Work Performed as to AWD

124. The preceding allegations of the Complaint are hereby re-alleged and incorporated herein.

125. Carter and AWD entered into a valid and enforceable contract, under which AWD agreed to compensate Carter for its work on the Project.

126. The Subcontract provides for the payment by AWD to Carter in the amount of $8,250,000, after all agreed-upon contract modifications, for completion of the work under the Subcontract.

127. Carter has fully performed its obligations under the Subcontract.

128. Carter has not been paid an amount of $120,432 for the unpaid retainage on the Subcontract, which is payable under Exhibit P.

129. If AWD has not been paid by the VA, Carter's work is not the reason for the VA's delay in paying AWD.

130. AW and DBC are jointly liable to Carter under the Subcontract.

131. AWD's refusal and failure to pay Carter this amount constitute a breach of contract.

Wherefore, Carter demands judgment in its favor and against AWD, AW, and DBC for its unpaid retainage in the amount of at least $120,432, together with interest and attorneys' fees, all costs of this action and such further legal and equitable relief as this Court deems just and proper.

## **COUNT IV: Breach of Contract as to AWD**

132. The preceding allegations of the Complaint are hereby re-alleged and incorporated herein.

133. Carter and AWD entered into a valid and enforceable contract, under which AWD agreed to compensate Carter for its work on the Project.

134. The Subcontract provides for the payment by AWD to Carter in the amount of $8,250,000, after all agreed-upon contract modifications, for completion of the work under the Subcontract.

135. In addition, the Subcontract requires AWD to compensate Carter for extra work required by AWD and for delays to Carter's performance caused by AWD.

136. Carter has fully performed its obligations under the Subcontract.

137. Carter has not been paid the due amount of $8,250,000 for its work under the Subcontract, plus amounts earned for extra work, for changes to the work, and for delays to Carter's work.

138. AW and DBC are jointly liable to Carter under the Subcontract.

139. AWD's refusal and failure to pay Carter the amounts due pursuant to the terms of the Subcontract constitute a breach of contract.

140. Wherefore, Carter demands judgment in its favor and against AWD, AW, and DBC in the amount of at least $7,939,278, together with interest and

attorneys' fees, all costs of this action and such further legal and equitable relief as this Court deems just and proper.

**COUNT V: Destruction of Business as to AWD, AW, and DBC (JURY TRIAL DEMANDED)**

141. The preceding allegations of the Complaint are hereby re-alleged and incorporated herein.

142. AWD made material representations to Carter concerning, without limitation: the price received by AWD on bid day from Creteseal, the delays to the Project and the reasons for delays; the merits of Carter's claims; the change order requests submitted by Carter on the Project; AWD's settlement with the VA; a backcharge against Carter; and its intention to pay Carter in accordance with the Subcontract.

143. The representations were false and were made either willfully to deceive or with reckless disregard as to the truth of those representations.

144. On information and belief, the misrepresentations were made to obtain a lower price from Carter or to put Carter out of business or to weaken it so that it could not survive to insist on just treatment by AWD, AW, DBC, or the Sureties.

145. The actions and omissions are part of a pattern and practice by AW on this job and, on information and belief, on other jobs as well.

146. The actions and omissions violate the commitments made by AWD to the VA, for the benefit of Carter, with respect to its hiring of Carter, a Small Disabled Veteran-Owned Business.

147. Carter relied to its detriment on the material representations made by AWD when it revealed to AWD its financial distress and sought assistance from AWD.

148. As a part of its pattern and practice, and in furtherance of its intent, AWD's response was to state that Carter's revelations were grounds for default of Carter.

149. AWD made such representations with the intention that Carter rely on them.

150. DBC either endorsed these actions, conspired with AW to accomplish the ill-willed goals of AW, or willfully ignored the actions by AW, because it was to DBC's benefit to do so.

151. Carter's reliance was reasonable.

152. Carter suffered damage as a result of AWD's false representations.

Wherefore, Carter demands judgment in its favor and against AWD in an amount to be determined by the trier of fact based upon the facts proved at trial, including without limitation any punitive or exemplary damages, together with

interest and attorneys' fees, all costs of this action and such further legal and equitable relief as this Court deems just and proper.

**COUNT VI: Bad Faith Refusal to Pay Claims as to Travelers and Liberty**
**(JURY TRIAL DEMANDED)**

153. The preceding allegations of the Complaint are hereby re-alleged and incorporated herein.

154. Sureties furnished the Payment Bond on the Project for the benefit of Carter, guaranteeing to the VA the payment of AWD's subcontractors.

155. Carter submitted its claims for payment to Sureties pursuant to the terms of the Bond numerous times.

156. Sureties have made representations contrary to the facts of this Project to justify their refusal to pay Carter.

157. The Sureties have acted unreasonably and know, or have chosen to ignore, that Carter's payments have been withheld improperly.

158. The Sureties have wrongly denied Carter's claims for payment under the Bond.

159. Carter is a first-party beneficiary of the Bond.

160. Each of Travelers and Liberty was required to investigate Carter's claims promptly and in good faith and to pay them, in whole or in part, based upon the independent investigation.

161. Liberty was aware of Carter's financial condition at all times during performance of the Project, as Liberty was Carter's bonding company. Liberty's knowledge is imputed to Travelers.

162. The Sureties are, and were at all time material hereto, aware of the consequences to Carter of non-payment, including the resulting loss of working capital, the loss of bonding capacity, and the near-default on its line of credit.

Wherefore, Carter demands judgment in its favor and against Sureties, separately, in an amount to be determined by the trier of fact based upon the facts proved at trial, including without limitation any punitive or exemplary damages, arising from each of the Sureties failure to investigate Carter's claim in good faith, together with interest and attorneys' fees, all costs of this action and such further legal and equitable relief as this Court deems just and proper.

**COUNT VII: Unjust Enrichment**

163. The preceding allegations of the Complaint are hereby re-alleged and incorporated herein.

164. Carter has performed substantial work for the benefit of AWD.

165. AWD has failed and refused to perform its obligation under the Subcontract.

166. Sureties have failed and refused to perform their obligations under the Bonds.

167. Carter is entitled to payment for the value of the services it performed in accordance with AWD's Subcontract.

Wherefore, Carter demands judgment in its favor and against Defendants in the amount of at least $8,250,000 or such amount as the trier of fact shall determine, together with statutory interest and attorneys' fees, all costs of this action and such further legal and equitable relief as this Court deems just and proper.

**Relief Requested**

Carter respectfully requests a trial by jury as to Counts V and VI and that the Court enter an Order granting the following relief:

(a) Requiring Defendant Sureties to pay Carter no less than $$7,939,278, if not $8,250,000, pursuant to the Payment Bond on its Miller Act claim;

(b) Requiring AWD to pay Carter its unpaid contract balance in the amount of $190,290;

(c) Requiring AWD to pay Carter its unpaid retainage in the amount of $120,432;

(d) Requiring AWD to pay Carter an amount of $7,939,278, if not $8,250,000, for its breaches of contract;

(e) Requiring AWD to pay Carter an amount to be determined by the trier of fact for AWD's misrepresentations, pattern and practice of attempting to

bully Carter and to destroy Carter's business, and it disregard of its obligations to a Small Disabled Veteran-owned Business;

(f) Requiring Travelers and Liberty to pay Carter an amount to be determined by the trier of fact for their bad faith investigation and refusal to pay Carter's claims;

(g) Requiring AWD, AW, and DBC to pay Carter an amount of at least $8,250,000 for the unjust enrichment of Defendants for services performed by Carter; and

(h) Requiring Defendants to pay Carter its costs, interest, and attorneys' fees, and further legal and equitable relief as this Court deems just and proper.

Respectfully submitted this 4th day of April, 2017,

Timothy A. Andreu
Florida Bar Number 443778
tandreu@bradley.com
**Bradley Arant Boult Cummings LLP**
100 North Tampa Street, Suite 2200
Tampa, Florida 33602
Telephone: (813) 559-5500
Facsimile: (813) 229-5946

-and-

E. Mabry Rogers (*pro hac vice* motion forthcoming)
mrogers@bradley.com
Carlyn E. Miller (*pro hac vice* motion forthcoming)
camiller@bradley.com
**Bradley Arant Boult Cummings LLP**
One Federal Place
1819 Fifth Avenue North
Birmingham, Alabama 35203-2119
Telephone: (205) 521-8000
Facsimile: (205) 521-8800
*Attorneys for Plaintiff*